Sophia M. Rios (SBN 305801)
**BERGER MONTAGUE PC**
401 B Street, Suite 2000
San Diego, CA 92101
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

*Counsel for Plaintiff*
*(additional counsel listed on signature page)*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER J. DONABEDIAN, individually and as representative of the classes,<br><br>        Plaintiff,<br><br>v.<br><br>SPECIALIZED LOAN SERVICING, LLC and FIRSTKEY MASTER FUNDING 2021-A COLLATERAL TRUST, U.S. BANK TRUST NATIONAL ASSOCIATION AS COLLATERAL TRUST TRUSTEE,<br><br>        Defendants. | Case No. 8:24-cv-00319<br><br>**CLASS ACTION COMPLAINT**<br><br>**(1) & (5) Fair Debt Collection Practices Act, 15 U.S.C. § 1692e;**<br>**(2) & (6) Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.17;**<br>**(3) Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;**<br>**(4) Declaratory Judgment, 28 U.S.C. § 2201**<br><br>JURY TRIAL DEMANDED |

Plaintiff Christopher J. Donabedian, on behalf of himself and the classes set forth below, files this Complaint against Defendants Specialized Loan Servicing, LLC ("SLS") and FirstKey Master Funding 2021-A Collateral Trust, U.S. Bank Trust National Association as Collateral Trust Trustee ("FirstKey") and alleges as follows:

## PRELIMINARY STATEMENT

1.     In the years leading up to the Great Recession, predatory subprime mortgage lenders targeted potential homebuyers like Plaintiff with what they marketed as a win-win offer:  the opportunity to own a home without having to put down a single dollar.   These so-called "80/20" mortgage schemes typically involved a two-pronged lending arrangement: a primary mortgage that covered 80% of the home's appraised value, plus a second "piggyback" mortgage—or, as here, a line of credit—that covered the remaining 20%.  The second loan or line of credit operated as a functional downpayment and allowed borrowers to forgo the protections of mortgage insurance.[1]

2.     In 2006, Plaintiff was lured by such an offer.  Along with a primary mortgage, he obtained a Home Equity Line of Credit ("HELOC") in the amount of $132,000.00, which allowed Plaintiff to obtain approval.

3.     The Truth in Lending Act ("TILA") and its enacting regulations required the creditor of Plaintiff's HELOC to provide monthly statements at all times in which there was an outstanding balance on the account.  By law, this

---

[1] The Consumer Financial Protection Bureau describes "80/20" loans as a type of "piggyback mortgage product" that "involved a first lien loan for 80% of the value of the home and a second lien loan for the remaining 20% of the home's valuation." *See* Consumer Fin. Prot. Bureau, *CFPB Issues Guidance to Protect Homeowners from Illegal Collection Tactics on Zombie Mortgages*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-to-protect-homeowners-from-illegal-collection-tactics-on-zombie-mortgages  (last visited Feb. 6, 2024).

Class Action Complaint
Case No. 8:24-cv-00319

periodic statement needed to apprise Plaintiff of the amount he owed, including any interest and fees.

4.    In 2010, at the height of the Great Recession, Plaintiff fell on hard times, but he was able to obtain a loan modification through the Home Affordable Modification Program ("HAMP").  That loan modification allowed Plaintiff to stay in his home.

5.    When his loan modification was approved, Plaintiff was led to believe that it included his HELOC, meaning that he would have one payment obligation relating to his home moving forward.  In keeping with that understanding, Plaintiff remained current on his first mortgage from that point on.

6.    Further cementing his belief that he was not behind on his HELOC, Plaintiff received no communications at all regarding his HELOC—no monthly statements, letters, or even phone calls—from 2010 to 2022.

7.    In fact, the only correspondence that Plaintiff received was a 2010 or 2011 notice from Ditech Financial LLC.  That notice advised Plaintiff only that Ditech Financial LLC was then the owner of the HELOC.

8.    During that period of silence, Plaintiff continued to build equity in his home by making regular payments on his first mortgage, which he assumed to be his only existing obligation relating to his home.

9.    Then, in February 2022, Plaintiff received a "Default Notice and Notice of Intent to Foreclose" from SLS, which indicated that Plaintiff missed a HELOC payment in November 2008 "and the payments due each month thereafter."

10.    SLS's letter advised Plaintiff that he needed to pay $155,894.73 to "cure the arrears" on the HELOC and that he had just thirty-three days to do so. Plaintiff had not previously known that SLS was the servicer of his HELOC.

11. Plaintiff, of course, could not pay more than $150,000 in just over one month, so he asked SLS if he could modify his HELOC. SLS, however, made any offer to refinance contingent on the payment of a substantial downpayment of more than $50,000. Plaintiff, naturally, could not afford that arrangement, either.

12. Several months later, in April 2023, Plaintiff received a "Notice of Default and Election to Sell Under Deed of Trust" from a debt collector acting on behalf of Defendants.

13. The debt collector's letter represented that Plaintiff's home could be sold without any court action and that Plaintiff now owed $171,029.97. In other words, Defendants claimed that Plaintiff owed nearly one-and-a-half times the original HELOC balance.

14. In November 2023, Plaintiff received notice that the foreclosure was scheduled for December 13, 2023.

15. Still unable to obtain a loan modification, Plaintiff filed for Chapter 13 bankruptcy on December 13, 2023.

16. Defendants' conduct caused Plaintiff significant financial and emotional harm, including, but not limited to: a reduction in his present and future home equity; the filing of Chapter 13 bankruptcy; emotional distress caused by the notices of sale and the vastly inflated claims of his outstanding debt; and distress from Defendants' surprise threats of foreclosure after over a decade of silence.

17. Plaintiff is far from the only victim of these opportunistic and predatory practices; indeed, as discovery will show, it is apparently standard policy and practice for SLS and FirstKey to violate federal law and demand payment of improper, retroactively assessed interest even for periods during which no periodic statements had been provided.

Class Action Complaint
Case No.

18.    Because Defendants are unwilling to halt their unlawful practices, Plaintiff brings this action on behalf of himself and all others similarly situated, for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, the Rosenthal Debt Collection Practices Act ("Rosenthal Act"), Cal. Civil Code § 1788, *et seq.*; and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*  Plaintiff also seeks a declaratory judgment that Defendants are not entitled to the HELOC balances that they have deceptively inflated following years of not sending statements.

## **PARTIES**

19.    Plaintiff Christopher J. Donabedian is a resident of North Tustin, California.

20.    Defendant SLS is a limited-liability company incorporated in Delaware with a principal place of business in Highlands Ranch, Colorado.

21.    Defendant SLS is a debt collector under the FDCPA, 15 U.S.C. § 1692a(6), because it treated Plaintiff's loan as in default at the time it acquired the loan's servicing rights.  *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir. 2003).

22.    Defendant FirstKey is a collateral trust that allows investors to have an interest in cash flows from pools of mortgage loans.  At all times relevant to this lawsuit, FirstKey acted as a debt collector under the FDCPA because it uses interstate commerce in its business, the principal purpose of which is debt collection.  15 U.S.C. § 1692a(6); *see also Henson v. Santander Consumer USA, Inc.*, 817 F.3d 131, 136 (4th Cir. 2016), *aff'd,* 582 U.S. 79 (2017).

23.    Upon information and belief, FirstKey's primary business and principal purpose is purchasing defaulted second mortgages on the secondary loan

Class Action Complaint
Case No.

market for nominal amounts and then seeking to recover the full amounts from consumers—in other words, debt collection.

24.     In conducting its debt-collection business, FirstKey uses interstate commerce, including the mail, when it sends communications to consumers attempting to collect debts from them.

25.     Upon information and belief, FirstKey's business involves interstate commerce because FirstKey owns mortgage assets across the United States.

26.     At all times relevant to this Complaint, SLS acted as FirstKey's agent and with FirstKey's express authority.  All of the actions taken by SLS were taken under the supervision or direction of FirstKey.

## JURISDICTION AND VENUE

27.     This Court has federal-question jurisdiction under 28 U.S.C. § 1331 and 15 U.S.C. § 1692k.  It also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

28.     This Court has personal jurisdiction over SLS.  SLS conducts business in this State, including real-estate foreclosures, and its conduct giving rise to this Complaint all occurred in this State.

29.     This Court has personal jurisdiction over FirstKey.  FirstKey conducts business in this State, including real-estate foreclosures, and its conduct giving rise to this Complaint all occurred in this State.

30.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

Class Action Complaint
Case No.

# FACTS

### *The Recent Rise of Illegal Collection Efforts on Zombie Second Mortgages*

31.    This case arises from the recent wave of attempts to collect "zombie" second mortgages—largely, subprime second mortgages that originated before the 2007–08 mortgage crisis.  These second mortgages, the vast majority of which are "subprime" mortgages that were originated in the years leading up to the 2007–08 mortgage crisis, are known as "zombies" because lenders ceased all collections efforts or communications with borrowers—often for a decade or more.  Yet now, after years without any communication, and often after a long chain of debt sales and re-sales, debt collectors are reemerging to demand exorbitant, retroactive interest amounts on top of debts that consumers had understandably believed were long dead.

32.    Before the mortgage crisis, second mortgages were often used in "80/20" mortgage schemes, which allowed underqualified borrowers to finance home purchases through a two-pronged lending arrangement—without a down payment and without having to pay for mortgage insurance.

33.    But second mortgages—or, as here, lines of credit—were incredibly disadvantageous for borrowers, as they often carried high interest rates and involved large balloon payments that became due at the end of the loan.

34.    Consequently, during the Great Recession, many borrowers in 80/20 mortgage schemes were required to modify their first mortgages to remain in their homes, while their second mortgages or lines of credit were charged off or significantly reduced or forgiven as part of the HAMP Second Lien Modification Program ("2MP Program").[2]

---

[2] *See* Department of Housing and Urban Development, *Making Home Affordable Program Performance Report Through May 2014*, at 2, *available at*

Class Action Complaint
Case No.

35.     Many second mortgages or lines of credit were charged off, meaning that they no longer incurred interest or late fees.  Once charged off, consumers no longer received statements or heard anything about their second mortgages or lines of credit, sometimes—like Plaintiff—for more than a decade.

36.     Unbeknownst to many consumers, however, their second mortgages or lines of credit did not go away.  Instead, they were sold—often several times— to various debt buyers and subprime lenders.

37.     Now, with the recent surge in housing prices, consumers have significant equity in their homes, which makes their charged-off second mortgages or lines of credit highly profitable.

38.     Debt buyers are now seeking to collect on defaulted second mortgages or lines of credit.  If consumers cannot pay, debt buyers are foreclosing on homes, selling the property, and taking the (often significant) equity to pay the outstanding debt—which they likely bought for pennies on the dollar.

39.     This highly profitable scheme has surged in recent months and years, as home prices have increased, and as COVID-19 foreclosure moratoriums have expired.

40.     The debt buyer here, FirstKey, along with its agent and servicer SLS, is using the foreclosure process to collect money to which it is not entitled, substantially diminishing the equity earned by consumers in their homes after recovering from the housing crisis.

_____

https://www.hud.gov/sites/documents/MAY2014MHAREPORTFINAL.PDF (noting that the Second Lien Modification Program "[p]rovides modifications and extinguishments on second liens when there has been an eligible first lien modification on the same property").

Class Action Complaint
Case No.

41.    But Defendants' collection attempts are in violation of federal law, which requires periodic statements for open-end consumer lines of credit, including HELOCs. 15 U.S.C. § 1637; 12 C.F.R. § 1026.7.

42.    Specifically, § 1637(b) of TILA provides that "[t]he creditor of any account under an open end consumer credit plan shall transmit to the obligor, for each billing cycle at the end of which there is an outstanding balance in that account or with respect to which a finance charge is imposed, a statement setting forth," among other things: (1) the outstanding balance of the account at the beginning of the period; (2) the finance charge applied to the outstanding balance; and (3) the outstanding balance at the end of the period.

43.    TILA's implementing regulations similarly require the creditor of a home-equity plan to provide periodic statements that disclose, among other information, the outstanding balance of the credit plan for that period and the periodic interest charged on the balance.  12 C.F.R. § 1026.7.

44.    These disclosure requirements are intended to prevent creditors, servicers, and debt collectors from hiding the ball, only to later demand payment for surprise interest and fees.  Yet such deceptive practices are precisely the conduct at issue here.

45.    Despite the periodic-statement requirement imposed by federal law, Defendants are—out of the blue—demanding payments on HELOC accounts that consist of waived balances and retroactively assessed interest.

46.    In Plaintiff's case, for example, his alleged balance is nearly one-and-a-half times the original balance.  The improper charges, by design, made it impossible for Plaintiff to refinance his HELOC, thereby ensuring that it would be paid in full through a foreclosure sale that will deprive him of his home.

Class Action Complaint
Case No.

47.     When debt collectors, like Defendants here, foreclose on properties and collect improperly assessed interest charges, they not only rob consumers of their homes, but they strip them of tens of thousands of dollars in equity—one of the primary ways that low- and middle-income families can build wealth.

### *Plaintiff's Zombie HELOC*

48.     Plaintiff purchased his home in Santa Ana, California in 2006.

49.     As was common at that time, Plaintiff financed the purchase using a two-pronged lending arrangement.  But instead of a closed-credit second mortgage, he received a HELOC in the principal amount of $132,000.00.[3]

50.     In 2010, at the peak of the Great Recession, Plaintiff needed mortgage assistance, so he obtained a loan modification that allowed him to stay in his home.

51.     Upon approval of his loan modification, Plaintiff was told that the new agreement included both his primary mortgage and his HELOC.  In other words, Plaintiff was told that, moving forward, he would need to make one consolidated payment so that he could stay current on his home.

52.     In keeping with that understanding, Plaintiff remained current on his first mortgage, as he believed that it was the only outstanding loan or line of credit. In fact, Plaintiff remains current on his first mortgage to this day.

53.     Cementing Plaintiff's understanding that he was not behind on his HELOC, no one contacted Plaintiff about his HELOC from 2010 to 2022.

54.     Plaintiff received no monthly statements, letters, or phone calls regarding his supposedly outstanding HELOC—not from any servicer, creditor, or debt collector.

---

[3]     https://www.consumerfinance.gov/ask-cfpb/what-is-a-piggyback-second-mortgage-en-1955/ (last visited Feb. 6, 2024).

Class Action Complaint
Case No.

55. In fact, the only correspondence that Plaintiff received regarding the existence of the HELOC was a 2010 or 2011 notice from Ditech Financial LLC. But that notice merely advised Plaintiff that Ditech Financial LLC was then the owner of the HELOC. It mentioned nothing about any payment obligations purportedly owed on the HELOC.

56. Believing that no obligation under the HELOC existed independent of his primary mortgage obligation, Plaintiff continued to build equity in his home by making regular payments on the primary mortgage.

57. Under federal law, Defendants and their predecessors-in-interest were required to provide statements for any billing cycle at the end of which the consumer owed an outstanding balance. 15 U.S.C. § 1637(b); 12 C.F.R. § 1026.7. By not providing periodic statements, Defendants and their predecessors implied to Plaintiff and the putative class members that no outstanding balance, including no interest and fees, existed on their HELOCs for the billing cycles in question.

58. By not sending monthly statements, Defendants and their predecessors-in-interest acted contrary to federal law, leading Plaintiff and similarly situated consumers to reasonably believe that their HELOCs had been discharged or their outstanding balances waived or merged with their primary mortgage obligations. Plaintiff and the putative class members relied on their reasonable beliefs when making debt obligation and repayment decisions, unknowingly to their detriment.

59. Further, by not providing monthly statements to Plaintiff and the putative class members, Defendants rendered it impossible for Plaintiff and the class members to perform under their credit line agreements and to avoid the accumulation of debt that Defendants now seek to enforce.

10

Class Action Complaint
Case No.

60.    By acting as if the debts had been discharged or waived and then seeking to enforce the debt—sometimes more than a decade later and with no notice to Plaintiff and the class members—Defendants waived their right to enforce those debts.

61.    At some point, FirstKey acquired Plaintiff's HELOC, likely for pennies on the dollar.

62.    Upon information and belief, SLS became the servicer of the HELOC at the time FirstKey acquired it.

63.    In February 2022, Plaintiff received a "Default Notice and Notice of Intent to Foreclose" from SLS, which indicated that Plaintiff missed a HELOC payment in November 2008 "and the payments due each month thereafter."

64.    That letter advised Plaintiff that he needed to pay $155,894.73 to "cure the arrears" on the HELOC.  Making matters worse, it told him that he had just thirty-three days to do so.

65.    Before his receipt of that letter, Plaintiff did not know that SLS was the servicer of his HELOC or that he owed any money on his HELOC, much less such a substantial sum.

66.    Plaintiff, of course, could not pay more than $150,000 and especially not on such short notice.

67.    Hoping to buy himself time, Plaintiff asked SLS if he could modify his HELOC.  SLS, however, made any offer to refinance contingent on the payment of a substantial downpayment of more than $50,000.  Plaintiff could not afford such an arrangement.

68.    Upon information and belief, SLS has a policy or practice of making its loan modification offers difficult to accept by design.  That is, SLS demands

Class Action Complaint
Case No.

substantial down payments knowing that consumers will not be able to afford the modification.

69. Several months later, in April 2023, Plaintiff received a "Notice of Default and Election to Sell Under Deed of Trust" from Affinia Default Services, LLC, a debt collector acting on behalf of Defendants.

70. That letter represented that Plaintiff's home could be sold without any court action and that Plaintiff now owed $171,029.97. In other words, Defendants claimed that Plaintiff owed nearly one-and-a-half times the original HELOC balance and more than $15,000 than what was purportedly owed just a year earlier.

71. In November 2023, Plaintiff received notice that a foreclosure sale of his home was scheduled for December 13, 2023.

72. Still unable to obtain a loan modification and out of alternative options with lesser consequences, Plaintiff filed for Chapter 13 bankruptcy on December 13, 2023.

73. The attempted foreclosure of Plaintiff's home was unlawful because Defendants were attempting to collect amounts that were not—and are not—owed by Plaintiff.

74. As a result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, financial and emotional harm, including, but not limited to, a reduction in his present and future home equity; the filing of Chapter 13 bankruptcy; emotional distress caused by the inaccurate notices of sale and the vastly inflated claims of his outstanding debt; and distress from Defendants' surprise threats of foreclosure after a decade of silence.

## CLASS ACTION ALLEGATIONS

75. Plaintiff brings his claims on behalf of himself individually and, under Federal Rule of Civil Procedure 23(b)(3), on behalf of the following classes:

Class Action Complaint
Case No.

### FDCPA Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) serviced or owned by Defendants; (iii) whose HELOC was in default at the time that Defendants acquired the HELOC or its servicing rights; (iv) to whom Defendants (or their predecessors-in-interest) failed to send periodic statements; and (v) to whom Defendants or their agents, during the one-year period prior to the filing of this Complaint, sent written correspondence referencing interest or late fees that purportedly accrued during any period in which Defendants or their predecessors-in-interest failed to send periodic statements.

### Rosenthal Act Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) serviced or owned by Defendants; (iii) to whom Defendants (or their predecessors-in-interest) failed to send periodic statements; and (iv) to whom Defendants or their agents, during the one-year period prior to the filing of this Complaint, sent written correspondence referencing interest or late fees that purportedly accrued during any period in which Defendants or their predecessors-in-interest had failed to send periodic statements.

### UCL Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) serviced or owned by Defendants; (iii) to whom Defendants (or their predecessors-in-interest) failed to send periodic statements; and (iv) to whom Defendants or their agents, during the four-year period prior to the filing of this Complaint, sent written correspondence referencing interest or late fees that purportedly accrued during any period in which Defendants or their predecessors-in-interest had failed to send periodic statements.

### Declaratory Judgment Class

All California consumers who (i) are or were obligors with respect to an open-end home-equity line of credit ("HELOC"); (ii) owned by

13

Class Action Complaint
Case No.

FirstKey; (iii) to whom FirstKey or its predecessors-in-interest failed to send periodic statements; and (iv) from whom FirstKey has asserted a right to collect interest or late fees that purportedly accrued during any period in which FirstKey or its predecessors-in-interest failed to send periodic statements.

76.    Plaintiff is a member and representative of all of the Classes.

77.    The Classes satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3).  Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

78.    **Numerosity**: The Classes are so numerous that joinder of all class members is impracticable.  Given the volume of Defendants' business, there exist hundreds or thousands of class members.

79.    **Commonality**: This case presents common questions of law and fact, including but not limited to:

a.    Whether Defendants violated the FDCPA and the Rosenthal Act by making false representations about the character, amount, or legal status of a debt; threatening to take actions that could not be legally taken; using false representations to attempt to collect a debt; and/or attempting to collect an amount not expressly authorized by a loan agreement;

b.    Whether Defendants' conduct was unlawful, unfair, or fraudulent under the UCL;

c.    The proper scope of injunctive relief; and

d.    The proper measure of damages.

80.    **Typicality**: Plaintiff's claims are typical of the members of the Classes.  The FDCPA, Rosenthal Act, and UCL violations suffered by Plaintiff are

Class Action Complaint
Case No.

typical of those suffered by other class members, and Defendants treated Plaintiff consistently with other class members, in accordance with their standard policies and practices.  Discovery will show that Defendants used automated processes to generate and send form debt-collection correspondence to class members and that Defendants maintain electronic records showing which form correspondence was sent to each class member, as well as the date(s) on which such correspondence was sent.  Discovery will also show that these debt-collection communications were often identical in both form and substance, except only for recipient-specific information about the recipient's name and address and the specific amounts Defendants claimed were owed.  Discovery will also show that Defendants maintain electronic records of amounts that they contend are owed by each borrower, as well as amounts paid by each borrower, including records of the dates on which each payment was made.

81.    **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes because he and his experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Classes.

82.    **Predominance & Superiority**:  Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendants' conduct, as described in this Complaint, stems from common and uniform policies and practices, and it has resulted in common violations of the FDCPA, the Rosenthal Act, and the UCL.  Members of the Classes do not have an interest in pursuing separate actions against Defendants, as the value of each class member's individual claim is small compared to the substantial expense, burden, and

Class Action Complaint
Case No.

uncertainty of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

83.    The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

## COUNT I

### Fair Debt Collection Practice Act ("FDCPA")

### 15 U.S.C. § 1692e

### (*Individually and on behalf of the FDCPA Class Against Defendants*)

84.    Plaintiff incorporates the preceding allegations.

85.    The FDCPA outlaws, among other conduct, the following debt collection practices: making false representations about the character, amount, or legal status of a debt (15 U.S.C. § 1692e(2)(A)); threatening to take action that cannot be legally taken (15 U.S.C. § 1692e(5)); and using a false representation to collect or attempt to collect a debt (15 U.S.C. § 1692e(10)).

86.    Defendants violated each of these provisions with respect to Plaintiff and the members of the FDCPA Class when they attempted to collect retroactively assessed interest and/or late fees that were illegal because they had purportedly accrued during a period in which Defendants had violated TILA and Regulation Z by failing to send periodic statements.

87.    Plaintiff and each member of the FDCPA Class suffered a concrete injury-in-fact as a result of Defendants' misrepresentations, including, for example,

16

Class Action Complaint
Case No.

a reduction in home equity, the assessment of improper fees, defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

88.    In addition, some members of the FDCPA Class suffered actual damages when they paid these improper fees or interest to Defendants.

89.    Under 15 U.S.C. § 1692k, Plaintiff seeks actual and statutory damages for himself and for each member of the FDCPA Class, plus reasonable attorneys' fees and costs.   He also seeks actual damages for members of the FDCPA Class who paid improper interest or fees to Defendants, in the amount of any such interest or fees.

## COUNT II

### Rosenthal Fair Debt Collection Practices Act
### Cal. Civ. Code § 1788.17

### (*Individually and on behalf of the Rosenthal Act Class Against Defendants*)

90.    Plaintiff incorporates the preceding allegations.

91.    Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692e and 1692k.

92.    Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection."   This broad definition of "debt

Class Action Complaint
Case No.

collector" applies to the FDCPA provisions incorporated by reference into Section 1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692e and 1692k. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

93.    Defendants therefore violated Section 1788.17 of the Rosenthal Act with respect to Plaintiff and the members of the Rosenthal Act Class when they attempted to collect retroactively assessed interest and late fees that were illegal because they had purportedly accrued during a period in which Defendants violated TILA and Regulation Z by failing to send periodic statements.

94.    Plaintiff and each member of the Rosenthal Act Class suffered a concrete injury-in-fact as a result of Defendants' misrepresentations, including, for example, a reduction in home equity; the assessment of improper fees; defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

95.    In addition, some members of the Rosenthal Act Class suffered actual damages when they paid these improper fees and interest to Defendants.

96.    Under 15 U.S.C. § 1692k, as incorporated by § 1788.17 of the Rosenthal Act, Plaintiff seeks actual and statutory damages for themselves and for each member of the Rosenthal Act Class, plus their reasonable attorneys' fees and costs. He also seeks actual damages for members of the Rosenthal Act Class members who paid improper interest or fees to Defendants, in the amount of any such interest or fees.

## COUNT III

### California Unfair Competition Law

Class Action Complaint
Case No.

**Cal. Bus. & Prof. Code §§ 17200 *et seq.***

***(Individually and on behalf of the UCL Class Against Defendants)***

97.    Plaintiff incorporates the preceding allegations.

98.    California's Unfair Competition Law ("UCL") prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.

99.    By prohibiting "unlawful business practices," the UCL effectively "borrows" violations of other laws and "treats them as unlawful practices that the unfair competition law makes independently actionable." *De La Torre v. CashCall, Inc.*, 5 Cal. 5th 966, 980 (2018).

100.    The remedies provided by the UCL "are cumulative to each other and to the remedies or penalties available under all other [California] laws."  Cal. Bus. & Prof. Code § 17205.

101.    An action for relief under the UCL may be brought by any person "who has suffered injury in fact and has lost money or property as a result" of the complained-of conduct.

102.    Here, Defendants' practices were "unlawful" under the UCL because, as alleged above, they violated TILA, the FDCPA, and the Rosenthal Act.

103.    Defendants' practices were also "unfair" under the UCL because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious to consumers to fail to communicate fees and interest for years, sometimes a decade or more, allowing balances to balloon without any notice to the consumers that might permit them to mitigate the harm.

104.    Further, Defendants' practices were "fraudulent" because they made false statements about the amounts legally owed by Plaintiff and members of the UCL Class and they omitted information necessary for Plaintiff and members of the UCL Class to assess the truth of Defendants' claims (*i.e.*, that the debts to which

Class Action Complaint
Case No.

Defendants claimed to be entitled were not owed due to Defendants' failure to provide periodic statements).

105.    The harm caused by these business practices vastly outweighs any legitimate utility they possibly could have.

106.    Plaintiff and members of the UCL Class suffered injuries in fact and have lost money or property because of Defendants' practices, which have caused an increase in their debt loads and a decrease in their home equity.

107.    Because, to this day, Defendants persist in their efforts to collect these illegitimate fees and interest, there is a real and immediate threat that Plaintiff and members of the UCL Class will suffer these same injuries again.

108.    Plaintiff and members of the UCL Class are therefore entitled to injunctive relief to correct the balances on their HELOCs; actual damages in the amount of any illegal fees or charges paid by the class members; and the recovery of their reasonable attorneys' fees and costs.

## COUNT IV

### Declaratory Judgment

### 28 U.S.C. § 2201

### (*Individually and on Behalf of the Classes Against FirstKey Only*)

109.    Plaintiff incorporates the preceding allegations.

110.    Because Plaintiff and class members were not provided periodic statements, all interest and fees assessed for periods in which FirstKey or its predecessors-in-interest failed to provide periodic statements are waived or unenforceable.

111.    Plaintiff and members of the Classes are subject to ongoing harm absent a declaration that interest and fees are waived or unenforceable, including the

Class Action Complaint
Case No.

accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

112.   This dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties. as well as the validity, if any, of the disputed interest and fees.

113.   Under 28 U.S.C. § 2201, there exists an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving Defendants' ongoing attempted imposition of retroactive interest and fees.

114.   Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed for periods in which FirstKey or its predecessors-in-interest failed to provide periodic statements are waived or unenforceable.

## COUNT V

### FDCPA

### 15 U.S.C. § 1692f(6)

### *(Individually on behalf of Plaintiff Against Defendants)*

115.   Plaintiff incorporates the preceding allegations.

116.   Defendants violated 15 U.S.C. § 1692f(6) when they attempted to foreclose on Plaintiff's property.  Defendants did not have any present right to possession of the property at the time that they scheduled the foreclosure sale.

117.   For example, Defendants lacked the present right to possession of Plaintiff's property because they never sent Plaintiff a Notice of Default that complied with Cal. Civ. Code § 2924.  The Notice of Default that Plaintiff received did not contain the correct amount of the delinquency required to cure the default, which is a condition precedent to foreclosure under California law.

21

Class Action Complaint
Case No.

118.    This defect in the Notice of Default was material, and it adversely affected Plaintiff's rights because it made it appear as if he owed significantly more than his actual loan balance.

119.    Any other actions that Defendants took towards the foreclosure of Plaintiff's property after it scheduled the foreclosure sale, including ordering a title search or advertising the foreclosure sale, also violated the FDCPA.

120.    As a result of Defendants' violations of 15 U.S.C. § 1692f, Plaintiff suffered actual damages, including significant emotional distress.

121.    Based on Defendants' violation of § 1692f, Plaintiff is entitled to actual damages, statutory damages, reasonable attorneys' fees, and costs under 15 U.S.C. § 1692k.

### COUNT VI

**Rosenthal Fair Debt Collection Practices Act**

**Cal. Civ. Code § 1788.17**

***(Individually on behalf of Plaintiff Against Defendants)***

122.    Plaintiff incorporates the preceding allegations.

123.    Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code."  In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692f(6) and 1692k.

124.    Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection."  This broad definition of "debt collector" applies to the provisions of FDCPA incorporated by reference into Section

Class Action Complaint
Case No.

1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692f(6) and 1692. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

125. Defendants violated Section 1788.17 of the Rosenthal Act when they attempted to foreclose on Plaintiff's home. Defendants did not have any present right to possession of Plaintiff's home at the time that it scheduled the foreclosure sale.

126. For example, Defendants lacked the present right to possession of Plaintiff's property because they never sent Plaintiff a Notice of Default that complied with Cal. Civ. Code § 2924. The Notice of Default that Plaintiff received did not contain the correct amount of the delinquency required to cure the default, which is a condition precedent to foreclosure under California law.

127. This defect in the Notice of Default was material, and it adversely affected Plaintiff's rights because it made it appear as if he owed significant more than his actual loan balance.

128. Any other actions that Defendants took towards the foreclosure of Plaintiff's property after it scheduled the foreclosure sale, including ordering a title search or advertising the foreclosure sale, also violated the Rosenthal Act.

129. As a result of Defendants' violations of 15 U.S.C. § 1692f, Plaintiff suffered actual damages, including significant emotional distress.

130. Under Cal. Civil Code § 1788 and 15 U.S.C. § 1692k, Plaintiff seeks actual and statutory damages for himself, plus his reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the Classes, seeks the following relief:

23

Class Action Complaint
Case No.

a. Determining that this action may proceed as a class action under Federal Rule of Civil Procedure 23;

b. Designating Plaintiff as the class representative for the Classes;

c. Designating Plaintiff's Counsel as counsel for the Classes;

d. Issuing proper notice to the Classes at Defendants' expense;

e. Declaring that Defendants committed multiple, separate violations of the FDCPA, the Rosenthal Act, and the UCL;

f. Declaring that amounts claimed by Defendants are not owed;

g. Awarding actual and statutory damages as provided by the FDCPA, the Rosenthal Act, and the UCL;

h. Granting appropriate injunctive relief, including restitution and disgorgement, as provided by the UCL;

i. Awarding reasonable attorneys' fees and costs and expenses; and

j. Granting other relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff, on behalf of himself and the Classes, demands a trial by jury on all issues triable by a jury.

Dated:  February 14, 2024                Respectfully submitted,

_/s/_Sophia M. Rios
Sophia M. Rios (SBN 305801)
**BERGER MONTAGUE PC**
401 B Street, Suite 2000
San Diego, CA 92101
Tel: (619) 489-0300
Fax: (215) 875-4604
srios@bm.net

24

Class Action Complaint
Case No.

Zachary M. Vaughan*
**BERGER MONTAGUE PC**
2001 Pennsylvania Ave NW, Suite 300
Washington, DC 20006
Tel: (202) 559-9740
zvaughan@bm.net

Kristi C. Kelly*
Casey S. Nash*
**KELLY GUZZO PLC**
3925 Chain Bridge Rd, Suite 202
Fairfax, VA 22030
Tel: (703) 424-7570
kkelly@kellyguzzo.com
casey@kellyguzzo.com

*pro hac vice forthcoming*

*Attorneys for Plaintiff*

Class Action Complaint
Case No.